MICHAEL R. SEW HOY (Cal. Bar No. 243391)
Email: SewhoyM@sec.gov
ROBERTO A. TERCERO (Cal. Bar No. 143760)
Email: TerceroR@sec.gov
MANUEL VAZQUEZ (Cal. Bar No. 295576)
Email: VazquezM@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:20-cv-08985 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| PATRICK JEVON JOHNSON, CHARLES EVERETT (aka CHARLY EVERETT), FRANK EKEJIJA, AND NVC FUND, LLC. | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of

1

the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Patrick Jevon Johnson resides in this district.

## SUMMARY

4.    This matter concerns a fraudulent scheme involving three microcap issuers controlled by a common CEO, defendant Patrick Jevon Johnson ("Johnson"): Cherubim Interests, Inc. ("CHIT"); PDX Partners, Inc. ("PDXP"); and Victura Construction Group, Inc. ("VICT," and collectively the "Issuers").  The scheme has two parts:  (1) conducting fraudulent Section 3(a)(10) transactions to obtain and sell unregistered shares of CHIT and VICT to the public markets; and (2) making false and misleading public statements to pump the stock of CHIT, VICT and PDXP.

### Fraudulent Section 3(a)(10) Transactions

5.    From November 2017 to January 2018, Johnson and defendant Charles Everett ("Everett"), another member of CHIT's and VICT's board of directors, fabricated documents to create fictitious debts to facilitate the offer and sale of securities in transactions purportedly exempt from registration under Section 3(a)(10) of the Securities Act [15 U.S.C. § 77c(a)(10)] ("Section 3(a)(10)").  That provision provides an exemption from registration when an issuer transfers securities "in exchange for one or more *bona fide* outstanding securities, claims, or property

interests" from the debtholder "where the terms and conditions of such issuance and exchange are approved" at a "fairness" hearing by a court.

6.     A Delaware corporation, Company A, purchased the fictitious debt from CHIT's and VICT's creditors, and then executed settlements with CHIT and VICT in which Company A received purportedly unrestricted shares for extinguishing the bogus claims.  Because of the fraudulent nature of the transactions, the CHIT and VICT transfer agent was deceived into issuing the shares to Company A without restrictive legends.

7.     Company A obtained and sold the stock into the market within days for gross proceeds of approximately $568,000.  In two of the VICT transactions, Everett received a total of $190,000 in kickbacks from the proceeds paid by Company A for the fake debt.  Through the fraudulent CHIT transaction, Johnson avoided repaying approximately $120,000 that CHIT owed after it was pre-paid for a construction job that it then failed to perform.

### False and Misleading Public Statements to Pump the Issuers' Stock

8.     In a series of six press releases and a Form 8-K (plus amendment) filed with the SEC between January to February 2018, the Issuers each publicly announced that they had entered into letters of intent and agreements to exchange their convertible preferred stock for hundreds of millions of dollars of "AAA" assets from defendant NVC Fund, LLC ("NVC Fund").  They further claimed that the value of the assets acquired was supported by audited financial statements of NVC Fund's holding company, and that the assets had been independently appraised and issued a AAA credit rating.  Johnson drafted and approved the issuance of each of these public statements, and defendant Frank Ekejija ("Ekejija"), NVC Fund's principal, reviewed and approved each of them.

9.     The announcements were materially false and misleading.  Johnson and Ekejija both knew that the touted nine-figure valuations had not been audited, and that the purported valuation and credit reports relied on dubious premises.  As a result

of these statements, the stock price and/or trading volume of CHIT, VICT and PDXP spiked.  On February 15, 2018, the SEC suspended trading in the Issuers' securities because of concerns about the adequacy and accuracy of information in the marketplace in the wake of these fraudulent statements.

10.    By this conduct, defendants Johnson and Everett violated the registration provisions of the federal securities laws and defendants Johnson, Everett, Ekejija and NVC Fund violated the antifraud and registration provisions of the federal securities laws.  Specifically:

(a)    Defendant Johnson violated Sections 5(a), 5(c), and 17(a)(1) and (a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a)-(c) thereunder;

(b)    Defendant Everett violated Sections 5(a), 5(c), and 17(a)(1)-(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; and

(c)    Defendants Ekejija and NVC Fund violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

11.    The SEC requests, among other things, that the Court:  (i) enjoin defendants Johnson, Everett, Ekejija, and NVC Fund from further violating the federal securities laws as alleged in this complaint; (ii) prohibit defendants Johnson and Everett from participating in the offer or sale of penny stock; (iii) prohibit defendants Johnson and Everett from serving as officers or directors of a public company; (iv) order defendant Everett to pay disgorgement with prejudgment interest; and (v) order defendants Johnson, Everett, Ekejija, and NVC Fund to pay civil monetary penalties based upon these violations.

## THE DEFENDANTS

12.    **Patrick Jevon Johnson** resides in Glendale, California.  During the relevant period, he was the CEO, a director, and a control person of CHIT, the CEO of PDXP, and the CEO, a director, and a control person of VICT. Johnson filed for

Chapter 7 bankruptcy in 2007.  In May 2018, the SEC staff properly served investigative subpoenas on Johnson, CHIT, PDXP, and VICT, and on December 21, 2018, sought from the U.S. District Court, Central District of California, an order to show cause and application for an order compelling compliance with the subpoenas. *SEC v. Cherubim Interests, Inc., et al.*, Case Number CV 18-MC-00175-SJO (ASx) (Dkt. 1.)  On January 30, 2019, the district court issued an order to show cause why an order compelling compliance with the investigative subpoenas should not be issued.  *Id.* (Dkt. 7.)  On March 14, 2019, Johnson, on behalf of himself, CHIT, PDXP, and VICT, agreed to comply with the subpoenas.  *Id.* (Dkt. 12.)

13.    **Charles Everett**, aka Charly Everett, resides in Fort Worth, Texas.  During the relevant period, Everett was chairman of the board of CHIT and director of VICT.

14.    **Frank Ekejija** resides in Dallas, Texas.  During the relevant period, he was the sole owner, trustee, and chairman of NVC Fund, the founder, trustee and chairman of NVC Fund Holding Trust, and solely controlled them both.  In June and September 2018, the SEC staff properly served investigative subpoenas on Ekejja and NVC Fund, and on November 30, 2018, sought from the U.S. District Court, Central District of California, an order to show cause and application for an order compelling compliance with the subpoenas.  *SEC v. NVC Fund LLC and Frank Ekejija*, Case Number CV 18-MC-00164-SJO (ASx) (Dkt. 1.)  On January 30, 2019, the district court issued an order to show cause why an order compelling compliance with the investigative subpoenas should not be issued.  *Id.* (Dkt. 9.)  On March 14, 2019, the district court granted an order compelling compliance with the subpoenas.  *Id.* (Dkt. 12.)

15.    **NVC Fund, LLC** is a Delaware corporation with headquarters in Dallas, Texas.  NVC Fund, which is wholly-owned by NVC Fund Holding Trust, claims to be a private equity fund that owns "trillions" of dollars in assets.

**RELATED ENTITIES**

16.     **Cherubim Interests, Inc.** ("CHIT"), is a Nevada corporation with headquarters in Bedford, Texas.  CHIT claims that it "specializes in alternative construction projects, as well as covering the entire spectrum of [real estate] development."  At all relevant times, CHIT has had securities registered under Section 12(g) of the Exchange Act and had a reporting obligation under Section 13(a).  On February 6, 2020, CHIT filed a Form 15 with the SEC terminating its registration under Section 12(g) of the Exchange Act.  CHIT's common stock was quoted on OTC Link under the ticker symbol "CHIT," until February 15, 2018, when the SEC suspended trading in its stock for ten business days.  Exchange Act. Rel. No. 82724 (Feb. 15, 2018).  On April 24, 2018, CHIT announced that it had been acquired by Trinity Conglomerate and on May 7, 2018, that iBrands Corporation, Inc. (OTC Link "IBRC") had acquired Trinity Conglomerate.

17.     **PDX Partners, Inc.** ("PDXP"), is a Wyoming corporation with headquarters in Portland, Oregon.  It claims to be a telecom company, which markets telecom products and acquires other long term growth assets.  It has not ever had a class of shares registered under Section 12 of the Exchange Act, and PDXP's common stock was quoted on OTC Link under the ticker symbol "PDXP" until February 15, 2018 when the SEC suspended trading for ten business days.  Exchange Act. Rel. No. 82725 (Feb. 15, 2018).  On April 24, 2018, PDXP announced that it had been acquired by Trinity Conglomerate and on May 7, 2018, that iBrands had acquired Trinity Conglomerate.

18.     **Victura Construction Group, Inc.** ("VICT"), is a Wyoming corporation with headquarters in Bedford, Texas.  VICT claims that it is "is a holding company focused on strategically acquiring businesses operating within the disaster recovery and restoration construction industries."  It is a nonreporting company, and its common stock was quoted on OTC Link under the ticker symbol "VICT" until February 15, 2018, when the SEC suspended trading in its stock for ten business

6

days.  Exchange Act Rel. No. 82726 (Feb. 15, 2018).  On April 24, 2018, VICT announced that it had been acquired by Trinity Conglomerate and on May 7, 2018, that iBrands had acquired Trinity Conglomerate.

## THE ALLEGATIONS

**A.     Johnson and Everett Orchestrate Fraudulent Section 3(a)(10) Transactions**

19.     Company A is in the business of obtaining stock at a discount from different issuers through transactions purportedly exempt, under Securities Act Section 3(a)(10), from the Securities Act's registration requirement.

20.     On three occasions from November 21, 2017 to January 31, 2018, Johnson and Everett orchestrated transactions in which Company A obtained and sold shares of CHIT and VICT in unregistered securities transactions.

21.     CHIT and VICT executed the transactions through interstate telecommunications networks and through the use of wires, including without limitation emails through the internet.

22.     Company A obtained and sold the shares pursuant to Section 3(a)(10) of the Securities Act, which purportedly exempted the transactions from the registration requirement under Section 5.

23.     Section 3(a)(10) permits an issuer to transfer securities "in exchange for one or more *bona fide* outstanding securities, claims, or property interests" from the debtholder "where the terms and conditions of such issuance and exchange are approved" at a judicial "fairness" hearing.

24.     Securities issued pursuant to Section 3(a)(10) are unrestricted and may generally be resold to the public market.

25.     Without the Section 3(a)(10) exemption, the securities are restricted, and to be validly resold, the securities must satisfy a resale exemption from registration, such as the Section 4(a)(1) and Section 4(a)(2) exemptions, for transactions by persons other than an issuer, underwriter or dealer.

26.     Neither the Section 3(a)(10) nor the Section 4(a) exemptions applied to

the CHIT and VICT transactions.

### 1. The General Pattern of the VICT and CHIT Transactions

27.     The three occasions in which Johnson and Everett arranged to have CHIT and VICT shares obtained by Company A, which then sold those shares, followed the same pattern of activities:

(a)     Johnson or Everett carried out a scheme by which they obtained or created invoices for debt owed by CHIT or VICT to third parties that was not due, owing, or otherwise *bona fide*.

(b)     A placement agent presented Company A with issuer candidates, including CHIT and VICT, who were interested in pursuing a Section 3(a)(10) transaction.

(c)     Johnson and Everett hoped to take advantage of the Section 3(a)(10) exemption in order to sell the shares to Company A initially without having to register the sale.  The shares would be unrestricted, which facilitated the subsequent resale of the shares to the general public.  The unrestricted feature was attractive to potential share purchasers in Section 3(a)(10) transactions, which would facilitate Johnson's and Everett's schemes.

(d)     Johnson and Everett arranged for the third parties that issued the false debt to sell that debt to Company A.

(e)     If Company A was interested, Company A asked the placement agent to review and confirm that the Issuer's debt was *bona fide* and outstanding.

(f)     If and when Company A was satisfied that the debt was *bona fide* and outstanding:  (i) it purchased the debt from the Issuer's creditors; and (ii) Company A executed a settlement agreement with the Issuer to forgive the debt in exchange for shares.

(g)     Company A next sued VICT or CHIT on the debt in Florida state court and concurrently moved for a fairness hearing to approve the settlement agreement.

(h)     Once the state court issued a fairness finding, Company A received stock certificates without a restrictive legend from the transfer agent, procured an attorney opinion letter that the shares could be resold without registration, deposited them in its brokerage account, and then sold them into the over-the-counter market for proceeds greater than the amount it had paid the Issuer's creditors for the supposed *bona fide* debt.

**2.     VICT Transaction 1**

28.     Gregg Construction Company, dba Metroplex Home Repair, Inc. ("Gregg"), a subsidiary of VICT, was in the business of restoring damaged homes.

29.     Gregg was generally paid by insurance carriers on a delayed basis.

30.     Everett, a control person of VICT, would often extend personal loans to Gregg.

31.     Beginning in or about mid-2017, Everett used a fraudulent Section 3(a)(10) transaction to obtain repayment for personal loans he had made to Gregg.

32.     In or about June or July 2017, Everett told a contractor of Gregg – Creditor A – that Gregg's financial difficulties made it unable to reimburse certain loans to Everett.

33.     To obtain repayment, Everett instead asked Creditor A to sell Company A fabricated Creditor A invoices that were copied from existing Creditor A invoices to Gregg that had already been paid.

34.     Everett explained that Creditor A would sell the invoices to Company A, and that the money for those invoices would come from an exchange of the invoices for VICT shares as part of a Section 3(a)(10) transaction.

35.     Everett asked Creditor A to give the money Creditor A received from Company A to Everett.

36.     Creditor A agreed to transfer the amounts it received to Everett.

37.     Everett told Creditor A's principal that the principal would have to

9

falsely confirm the validity of the debts during Company A's due diligence process.

38.     The principal agreed to do so in order to maintain Creditor A's business relationship with Gregg.

39.     In or about November 2017, Everett prepared several new, fabricated Creditor A invoices, dated between March and April 2017, that made it appear as if VICT owed Creditor A approximately $146,000 for flooring supplies and installation services.

40.     These invoices had already been paid by Gregg or did not represent services Creditor A had performed or supplies Creditor A had provided.

41.     Everett prepared, for each purported invoice, a bogus acceptance document on VICT's letterhead that included a line for the sub-contractor, Creditor A, to sign.

42.     Everett falsely signed each acceptance document on Creditor A's behalf.

43.     Everett then took this fabricated documentation to Johnson, VICT's CEO, control person, and director.

44.     Johnson presented the purported VICT debt to the placement agent with a copy to Company A for its review as part of a proposed Section 3(a)(10) transaction.

45.     During Company A's due diligence process, Creditor A's principal falsely confirmed to the placement agent and Company A the purported validity of the debt.

46.     During Company A's due diligence process, Creditor A's principal did not reveal the kickback Everett would later receive from Creditor A after Company A paid Creditor A.

47.     Company A and Creditor A executed a claim purchase agreement signed on or about November 21, 2017, whereby Company A acquired the approximately $146,000 in debt owed by VICT to Creditor A in exchange for payments to Creditor A totaling the same amount.

48. In the claim purchase agreement, Creditor A falsely stated in the representations and warranties section that Creditor A will not use the sale proceeds received from Company A to provide consideration to VICT.

49. Company A and VICT signed a settlement agreement and stipulation dated November 21, 2017 resolving the approximately $146,000 debt Company A acquired from Creditor A.

50. In the settlement and stipulation, VICT falsely stated in the representations and warranties section that the Creditor A debt included in the VICT Section 3(a)(10) transactions was accurately described, *bona fide*, and outstanding.

51. In the settlement and stipulation, VICT falsely stated in the representations and warranties section that Creditor A will not use the sale proceeds received from Company A to provide consideration to VICT.

52. On or about November 21, 2017, Company A filed a lawsuit in a Florida state court against VICT to collect upon the debt owed by VICT, valued at approximately $146,000, and Company A and VICT simultaneously filed pleadings seeking the court's approval for a proposed settlement.

53. The Florida state court issued an order declaring the settlement fair and Company A's sale of VICT shares exempt from registration under the Securities Act pursuant to Section 3(a)(10) of the Securities Act on or about November 22, 2017.

54. As a result, Company A was able to obtain the VICT shares without a restrictive legend from VICT's transfer agent.

55. Company A then deposited approximately 146 million VICT shares from that Section 3(a)(10) transaction into its brokerage account.

56. From on or about November 28, 2017 to on or about January 30, 2018, Company A then sold about 146 million VICT shares into the public market for proceeds of about $350,000.

57. Company A began selling the shares only days after buying them.

58. Company A purchased the VICT shares with a "view to" distribute and

sell those shares in open market over-the-counter transactions.  It is therefore a statutory underwriter.

59.     Company A paid Creditor A approximately $146,000 in three installments, using VICT stock sales proceeds to fund the last two.

60.     Creditor A then transferred the approximately $146,000 back to Everett.

a.     **Johnson and Everett offered and sold unregistered securities**

61.     The offers and sales of VICT securities were not registered with the SEC.

62.     First, VICT sold unregistered shares of its stock when transferring ownership of that stock to Company A in exchange for Company A's agreement to extinguish the bogus debt described above.

63.     Because Johnson directed VICT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange, Johnson offered and sold unregistered securities.

64.     Johnson was a substantial participant and a necessary factor in VICT's offers and sales of unregistered VICT shares to Company A because he directed VICT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange.

65.     Everett was a substantial participant and a necessary factor in VICT's offers and sales of unregistered VICT shares to Company A because he orchestrated the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor A.

66.     Second, Company A sold the unregistered VICT shares to the public.

67.     Johnson and Everett were each a substantial participant and a necessary factor in Company A's offers and sales of unregistered VICT shares to the public because: (i) Johnson signed the settlement agreement and organized and controlled

the Section 3(a)(10) transaction for VICT and (ii) Everett orchestrated the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor A.

68.     The offers and sales were not exempt under Section 3(a)(10) because the Creditor A debts were not *bona fide* and outstanding, and the true terms and conditions of the exchange were not considered by the Florida state court, due to the fabricated and altered documents created by Everett.

69.     The offers and sales were not exempt under Section 4(a)(1) or Section 4(a)(2) because Company A purchased the VICT shares with a view towards distribution and resold soon after purchase.

### b.     Everett misled and deceived market professionals

70.     Everett engaged in acts, transactions, and artifices which deceived market professionals by giving the false appearance that VICT owed money to Creditor A for flooring services and supplies, even though the debts had already been paid or were not *bona fide*.

71.     Everett engaged in acts, transactions, and artifices which deceived market professionals giving a false and misleading impression that the Section 3(a)(10) exemption requirements had been met.

72.     Everett gave the fabricated debt documents to Johnson, which were submitted to Company A, its placement agent, and eventually the court for review.

73.     Everett also persuaded Creditor A's principal to confirm the debts during the due diligence process and hide the later kickback Everett would receive from the money Company A paid Creditor A.

74.     Everett knew, or was reckless in not knowing, that the Section 3(a)(10) process required the exchange of *bona fide* debt relief for stock.

75.     Prior to November 2017, Everett learned from VICT's COO that in order to proceed with a Section 3(a)(10) transaction, the extinguished debt had to be

valid.

76.     On or about August 2017, the COO specifically asked Everett what outstanding debt Everett was considering for a Section 3(a)(10) transaction, and Everett identified the purported amounts owed to Creditor A as outstanding, when he knew they were not.

77.     On or about three weeks before Company A filed its Section 3(a)(10) complaint, Everett saw the term sheet for the agreement between Company A and VICT, which stated that VICT had to submit "liabilities."

78.     Everett fabricated debts for inclusion into the transactions with Company A.

79.     Everett knew, or was reckless in not knowing, that the VICT invoices represented a debt to Creditor A that did not exist.

80.     Everett was also negligent. A reasonably careful person would not fabricate documents, or convince others to engage in deception, and would comply with the requirements for registering a securities offering or seeking an exemption to the requirement.

81.     Everett's deceptions facilitated the sale of the VICT shares to Company A.

82.     Had the Florida court known the true nature of the purported debts, it would not have issued the fairness opinion, the transfer agent would not have issued stock certificates without a restrictive legend, and the brokerage firm would not have accepted Company A's shares so that they could be sold publicly.

83.     This information was material because whether the shares were unrestricted would be important to a reasonable investor's investment decision.

**3.      VICT Transaction 2**

84.     On or about January 11, 2018, Everett again arranged with Creditor A for Creditor A to sell VICT invoices totaling approximately $176,000 to Company A.

85.     Everett and Creditor A understood that, like in the prior VICT

transaction, Creditor A would sell the invoices to Company A, and that the money for those invoices would come from an exchange of the invoices for VICT shares as part of a Section 3(a)(10) transaction.

86. Everett asked Creditor A to give the money Creditor A received from Company A to Everett.

87. Creditor A agreed to transfer the amounts it received to Everett.

88. These invoices had already been paid or did not represent services Creditor A had performed or supplies Creditor A had provided.

89. Everett knew that these invoices had already been paid or did not represent services Creditor A had performed or supplies Creditor A had provided.

90. Everett submitted invoices and acceptance documentation to Johnson, VICT's CEO, control person, and director.

91. Johnson presented the purported VICT debt to the placement agent with a copy to Company A for its review as part of a proposed Section 3(a)(10) transaction.

92. During Company A's due diligence process, Creditor A's principal falsely confirmed to Company A and the placement agent the purported validity of the debt.

93. During Company A's due diligence process, Creditor A's principal confirmed that the debt was valid and outstanding. Also, Creditor A's principal did not reveal the kickback Everett would later receive from Creditor A after Company A paid Creditor A.

94. Company A and Creditor A executed a claim purchase agreement signed on or about January 30, 2018, whereby Company A acquired the approximately $176,000 in debt owed by VICT to Creditor A in exchange for payments to Creditor A totaling the same amount.

95. In the claim purchase agreement, Creditor A falsely stated in the representations and warranties section that Creditor A would not use the sale

proceeds received from Company A to provide consideration to VICT.

96. Company A and VICT signed a settlement agreement and stipulation dated January 30, 2018 resolving the approximately $176,000 in debt Company A acquired from Creditor A.

97. VICT falsely stated in the representations and warranties section of its settlement agreement with Company A that the Creditor A debt included in the VICT Section 3(a)(10) transactions was accurately described, *bona fide*, and outstanding.

98. On or about January 30, 2018, Company A filed a lawsuit in a Florida state court against VICT to collect upon the debt owed by VICT, valued at approximately $176,000, and Company A and VICT simultaneously filed pleadings seeking the court's approval for a proposed settlement.

99. The Florida state court issued an order declaring the settlement fair and Company A's sale of VICT shares exempt from registration under the Securities Act pursuant to Section 3(a)(10) of the Securities Act on or about January 31, 2018.

100. As a result, Company A was able to obtain the VICT shares without a restrictive legend from VICT's transfer agent.

101. Company A then deposited approximately 65 million VICT shares from that Section 3(a)(10) transaction into its brokerage account.

102. From on or about February 1 to on or about February 14, 2018, Company A sold the approximately 65 million shares for proceeds of about $122,000.

103. Company A began selling the shares only days after buying them.

104. Company A purchased the VICT shares with a "view to" distribute and sell those shares in open market over-the-counter transactions. It is therefore a statutory underwriter.

105. Company A expected to pay Creditor A approximately $176,000 in four equal payments of approximately $44,000.

106. Company A paid Creditor A approximately $44,000, the first of four payments.

107.   Creditor A transferred this approximately $44,000 to Everett.

108.   The SEC suspended trading in VICT securities, including its stock on February 15, 2018, including trading by Company A.  Exchange Act Rel. No. 82726 (Feb. 15, 2018).

109.   Company A declared an event of default on this VICT transaction and notified Creditor A.  Company A did not pay the other three installments under its agreement with Creditor A.

110.   Creditor A also made no further payments to Everett.

### a.   Johnson and Everett offered and sold unregistered securities

111.   The offers and sales of VICT securities were not registered with the SEC.

112.   First, VICT sold unregistered shares of its stock when transferring ownership of that stock to Company A in exchange for Company A's agreement to extinguish the bogus debt described above.

113.   Because Johnson directed VICT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange, Johnson offered and sold unregistered securities.

114.   Johnson was a substantial participant and a necessary factor in VICT's offers and sales of unregistered VICT shares to Company A because he directed VICT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange.

115.   Everett was a substantial participant and a necessary factor in VICT's offers and sales of unregistered VICT shares to Company A because he orchestrated the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor A.

116.   Second, Company A sold the unregistered VICT shares to the public.

117.   Johnson and Everett were each a substantial participant and a necessary factor in Company A's offers and sales of unregistered VICT shares to the public because:  (i) Johnson signed the settlement agreement and organized and controlled the Section 3(a)(10) transaction for VICT; and (ii) Everett orchestrated the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor A.

118.   The offers and sales were not exempt under Section 3(a)(10) because the Creditor A debts were not *bona fide* and outstanding, and the true terms and conditions of the exchange were not considered by the Florida state court, due to the fabricated and altered documents created by Everett.

119.   The offers and sales were not exempt under Section 4(a)(1) or Section 4(a)(2) because Company A purchased the VICT shares with a view towards distribution and resold soon after purchase.

### b.   Everett misled and deceived market professionals

120.   Everett engaged in acts, transactions, and artifices which deceived market professionals and the investing public by giving the false appearance that VICT owed money to Creditor A for flooring services and supplies, even though the debts had already been paid or were not *bona fide*.

121.   Everett engaged in acts, transactions, and artifices which deceived market professionals giving a false and misleading impression that the Section 3(a)(10) exemption requirements had been met.

122.   Everett gave the documents to Johnson, which were submitted to Company A, its placement agent, and eventually the court for review.

123.   Everett also persuaded Creditor A's principal to confirm the debts during the due diligence process and hide the later kickback he would receive from the money Company A paid Creditor A.

124.   Everett knew, or was reckless in not knowing, that the Section 3(a)(10)

process required the exchange of debt relief for stock.

125.   Prior to November 2017, Everett learned from VICT's COO that in order to proceed with a Section 3(a)(10) transaction, the extinguished debt had to be valid.

126.   In or about August 2017, the COO specifically asked Everett what outstanding debt Everett was considering for a Section 3(a)(10) transaction, and Everett identified the purported amounts owed to Creditor A as outstanding, when he knew they were not.

127.   Everett fabricated debts for inclusion into the transactions with Company A.

128.   Everett knew, or was reckless in not knowing, that the VICT invoices represented debts to Creditor A that did not exist.

129.   Everett was also negligent.  A reasonably careful person would not fabricate documents, or convince others to engage in deception, and would comply with the requirements for registering a securities offering or seeking an exemption to the requirement.

130.   Everett's deceptions facilitated the sale of the VICT shares to Company A.

131.   Had the Florida court known the true nature of the purported debts, it would not have issued the fairness opinion, the transfer agent would not have issued stock certificates without a restrictive legend, and the brokerage firm would not have accepted Company A's shares so that they could be sold publicly.

132.   This information was material because whether the shares were unrestricted would be important to a reasonable investor's investment decision.

### 4.   CHIT Transaction

133.   In April 2017, CHIT was hired and paid approximately $193,000 by Company B, a cannabis grower, to build a cannabis growing facility.

134.   CHIT did not complete the work.

135.   After CHIT failed to complete the work, Company B asked one of its creditors ("Creditor B"), which had originally been slated to be the HVAC subcontractor on the project, to take over all construction, and demanded the unused portion of its money – approximately $120,000 – back from CHIT.

136.   Instead of returning the money to Company B, Johnson, CEO and director of CHIT, devised a fraudulent Section 3(a)(10) transaction scheme to pay Creditor B to perform about $120,000 worth of work for Company B, therefore resolving its dispute.

137.   In October 2017, Johnson persuaded Creditor B to sign a subcontractor agreement with CHIT.

138.   In October 2017, Johnson also persuaded Creditor B to issue a $120,000 invoice for HVAC work Creditor B had not performed for CHIT to use as "debt" in a Section 3(a)(10) exchange.

139.   Johnson persuaded Creditor B to sell the purported debt to a Section 3(a)(10) debt purchaser (Company A) and then use the sales proceeds to complete the greenhouse build, and CHIT would keep all $193,000 Company B had already paid it.

140.   Creditor B entered into this subcontractor agreement, but with a VICT subsidiary, Cherubim Builders Group, LLC, not CHIT.

141.   Creditor B issued a $120,000 invoice for HVAC work to VICT.

142.   The invoice was dated October 6, 2017.

143.   The invoice made it appear that Creditor B had completed the invoiced work and now had an outstanding debt.

144.   Creditor B had not, in fact, performed the HVAC work at the time it issued the invoice.

145.   Johnson caused Creditor B to backdate the subcontractor agreement between the VICT subsidiary, Cherubim Builders Group, LLC, and Creditor B to June 1, 2017, to make it appear as if Creditor B had been hired months earlier, thus

furthering the misimpression that the invoiced work had been completed.

146.   The $120,000 debt was neither outstanding nor *bona fide*.

147.   Creditor B did not begin the invoiced work for Company B until after October 1, 2017, and did not complete the project for at least another six months.

148.   Johnson was initially unable to place the debt as part of a VICT, and not CHIT, Section 3(a)(10) transaction, because he had not supplied the subcontractor agreement with Cherubim Builders Group, LLC's signature.

149.   Johnson altered the bogus October 2017 invoice to make it appear as if CHIT rather than VICT or Cherubim Builders Group, LLC owed Creditor B.

150.   In January 2018 Johnson presented the purported CHIT debt to the placement agent with a copy to Company A for their review as part of a proposed Section 3(a)(10) transaction.

151.   During Company A's due diligence process, the Creditor B principal falsely confirmed to Company A and the placement agent the purported validity of the debt.

152.   Company A and Creditor B executed a claim purchase agreement signed on or about January 30, 2018, whereby Company A acquired the $120,000 debt owed by CHIT to Creditor B in exchange for payments to Creditor B totaling $120,000.

153.   In the claim purchase agreement, Creditor B falsely stated in the representations and warranties section that Creditor B will not use the sale proceeds received from Company A to provide consideration to CHIT.

154.   Company A and CHIT signed a settlement agreement dated January 30, 2018, wherein Johnson, on behalf of CHIT, represented that the liabilities were *bona fide* outstanding, past due, and that the invoices were accurate descriptions of the debt, including the amounts owed.

155.   On January 30, 2018, Company A filed a lawsuit in a Florida state court against CHIT to collect upon a debt owed by CHIT, valued at $120,000, and Company A and CHIT simultaneously filed pleadings seeking the court's approval

for a proposed settlement.

156. The Florida state court issued an order declaring the settlement fair and Company A's sale of CHIT shares exempt from registration under the Securities Act pursuant to Section 3(a)(10) of the Securities Act on or about January 31, 2018.

157. As a result, Company A was able to obtain the CHIT shares without a restrictive legend from CHIT's transfer agent.

158. Company A then deposited approximately 371 million CHIT shares from that Section 3(a)(10) transaction into its brokerage account.

159. From on or about February 6 to on or about February 15, 2018, Company A then sold about 283 million CHIT shares into the public market for proceeds of about $94,000.

160. Company A began selling the shares only days after buying them.

161. Company A purchased the CHIT shares with a "view to" distribute and sell those shares in open market over-the-counter transactions.  It is therefore a statutory underwriter.

162. Company A paid Creditor B only the first of four equal payments of approximately $30,000.

163. The SEC suspended trading in CHIT securities, including its stock, on February 15, 2018.  Exchange Act Rel. No. 82726 (Feb. 15, 2018).

164. Company A could not deposit any additional shares.

165. Company A declared an event of default as to Creditor B and ceased making payments.

166. CHIT never paid Company B the $193,000, so Company B used its other funds to complete the project.

### a.    Johnson offered and sold unregistered securities

167. The offers and sales of CHIT securities were not registered with the SEC.

168. First, CHIT sold unregistered shares of its stock when transferring

ownership of that stock to Company A in exchange for Company A's agreement to extinguish the bogus debt described above.

169.   Because Johnson directed CHIT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange, Johnson offered and sold unregistered securities.

170.   Johnson was a substantial participant and a necessary factor in CHIT's offers and sales of unregistered CHIT shares to Company A because he directed CHIT to engage in these Section 3(a)(10) transactions and, *inter alia*, signed the settlement agreements with Company A that formed the basis for the debt exchange.

171.   Second, Company A sold the unregistered CHIT shares to the public.

172.   Johnson was a substantial participant and a necessary factor in Company A's unregistered offer and sale of the securities because Johnson (i) signed the settlement agreement and organized and controlled the Section 3(a)(10) transaction for CHIT and (ii) orchestrated the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor B.

173.   The offers and sales were not exempt under Section 3(a)(10) because the Creditor B debts were not *bona fide* and outstanding, and the true terms and conditions of the exchange were not considered by the Florida state court, due to the fabricated and backdated documents created or caused to be created by Johnson.

174.   The offers and sales were not exempt under Section 4(a)(1) or Section 4(a)(2) because Company A purchased the CHIT shares with a view towards distribution and resold soon after purchase.

### b.     Johnson misled and deceived market professionals

175.   Johnson engaged in acts, transactions, and artifices which deceived market professionals by giving the false appearance that CHIT owed money to Creditor B, even though the debt did not exist and no work had been done.  Johnson

instructed Creditor B to backdate the subcontractor agreement to lend credibility to the transaction by showing there had been sufficient time for Creditor B to complete the purported project.  Johnson also signed the settlement agreement, which falsely stated that the debt was *bona fide* and outstanding.

176.   Johnson engaged in acts, transactions, and artifices which deceived market professionals, giving a false and misleading impression that the Section 3(a)(10) exemption requirements had been met.

177.   Johnson knew, or was reckless in not knowing, that the Section 3(a)(10) process required the exchange of debt relief for stock.

178.   Johnson knew, or was reckless in not knowing, that the CHIT invoice represented a debt to Creditor B that did not exist and was nothing more than a deceptive device to avoid repaying Company B.

179.   Johnson was also negligent. A reasonably careful person would not fabricate documents, or convince others to engage in deception, and would comply with the requirements for registering a securities offering or seeking an exemption to the requirement.

180.   Johnson's deceptions facilitated the sale of the CHIT shares to Company A.

181.   Had the Florida court known the true nature of the purported debts, it would not have issued the fairness opinion, the transfer agent would not have issued stock certificates without a restrictive legend, and the brokerage firm would not have accepted Company A's shares so that they could be sold publicly.

182.   This information was material because whether the shares were unrestricted would be important to a reasonable investor's investment decision.

**B.    Johnson, Ekejija and NVC Fund Carry Out a Scheme to Pump the Issuers' Stock**

183.   In January and February 2018, Johnson, Ekejija and NVC Fund carried out a fraudulent scheme to pump the three Issuers' stock (VICT, CHIT and PDXP), a

scheme halted only by the SEC's suspension of trading in the three Issuers' stock on February 15, 2018.

184.   This scheme involved several rounds of materially false public announcements and related Forms 8-K filed with the SEC by the Issuers, stating that the Issuers were acquiring $700 million in assets from NVC Fund, a purported private equity fund controlled by Ekejija, the parent of which claimed to own "trillions" of dollars in assets, including $1.3 trillion in Wyoming mineral rights.  In exchange, the Issuers agreed to transfer shares of their preferred stock to NVC Fund.  Appendix A identifies the announcements and Forms 8-K at issue.

185.   In or about December 2017, before the statements were issued, Ekejija consulted with an associate ("Associate A") regarding business opportunities for NVC Fund and NVC Fund Holding Trust.

186.   In or about December 2017, before the statements were issued, Associate A discussed with Ekejija a partnership with Johnson and the Issuers.

187.   In or about December 2017, before the statements were issued, Associate A introduced Johnson to Ekejija.

188.   Before Ekejija approved the statements, in or about December 2017, he was told by Associate A over electronic Skype message that once announced, the purported asset deals should dramatically increase the Issuers' stock price, possibly allow them to then tap into a "$1 billion" line of credit, and potentially permit the Issuers to list their stock on NASDAQ.

189.   Johnson prepared all six of the Issuers' public announcements, approved their issuance, issued the press releases, and filed CHIT's Forms 8-K.

190.   Prior to their issuance and filing, Ekejija reviewed and approved all six of the Issuers' public announcements and Forms 8-K on behalf of NVC Fund.

191.   As part of the claimed $700 million asset acquisition, Johnson also agreed to pay Ekejija and NVC Fund an additional $250,000 in compensation.

192.   Johnson ultimately paid Ekejija only $23,750 of the promised $250,000.

193.    Following these public announcements and CHIT's Form 8-K filings, the stock price for the Issuers and their trading volume increased.

194.    Because of the concern over the inaccuracy of the Issuers' disclosures and the possibility that their stock was being manipulated, the SEC suspended trading in the securities of the Issuers on February 15, 2018, for ten business days.  Exchange Act Rel. Nos. 82724 (CHIT), 82725 (PDXP), 82726 (VICT) (Feb. 15, 2018).

**1.    The First Round of False and Misleading Public Announcements**

195.    In press releases dated January 3, 2018 and January 4, 2018, the Issuers each announced the execution of letters of intent to acquire a total of $700 million in assets from NVC Fund in exchange for convertible preferred stock from each of the Issuers.

196.    In a January 3, 2018 press release, CHIT "announces it has signed a Letter of Intent to acquire USD $250,000,000 in Assets from NVC Fund LLC a Delaware, LLC ("NVC"), a wholly owned subsidiary of NVCFUND Holding Trust, respectively."

197.    In a January 4, 2018 press release, VICT "announces that it has signed a Letter of Intent to acquire USD $100,000,000 in assets from NVC Fund LLC a Delaware, LLC ("NVC"), a wholly owned subsidiary of NVCFUND Holding Trust, respectively."

198.    In a January 4, 2018 press release, PDXP "announces that it has executed a Letter of Intent to acquire USD $350,000,000 in assets from NVC Fund LLC a Delaware, LLC ("NVC"), a wholly owned subsidiary of NVCFUND Holding Trust, respectively."

199.    Each of these Issuer releases also states that the Issuer (CHIT, VICT, and PDXP) "acqui[red] … these NVC Assets with Convertible Preferred Stock … ."

200.    Each release also states that "NVC FUND HOLDINGS entities manage[s] assets supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value."

### a.   The first round of announcements falsely stated that an audit of NVC Fund Holding Trust had been conducted

201.   The Issuers' press releases' statement that NVC Fund Holdings Trust's "trillion" dollar valuation was supported by "financial statements" that were audited by a "CPA firm" was false.

202.   In or about April 2017, Associate A introduced Ekejija to a Turkish accountant ("Preparer A").

203.   NVC Fund Holdings Trust and Ekejija retained Preparer A, who then associated himself with a Turkish accounting firm ("Standards and Partners").

204.   Preparer A and Standards and Partners, however, only conducted a "review" of the financial statements of NVC Fund Holding Trust, and not an independent verification of the NVC Fund Holding Trust or NVC Fund's assets or bank accounts.

205.   During the relevant time period, no audit of NVC Fund Holding Trust or NVC Fund's financial statements was conducted by Standards and Partners.

206.   Preparer A and Standards and Partners prepared a report on the NVC Fund Holding Trust dated August 2017 (the "August 2017 report").

207.   In the cover letter of the August 2017 report, Preparer A and Standards and Partners stated that "we do not express an audit opinion" because its review was "substantially less in scope than an audit conducted in accordance with International Standards on Auditing," and that they could not "reconcile [NVC Fund Holding Trust's] bank accounts" because "[t]he reconciliation letters did not come from the Banks."

208.   The August 2017 report was not referenced in any of the six press releases at issue, nor was it filed with CHIT's Form 8-K and Form 8-K/A at issue.

209.   It would have been important to a reasonable investor to know that neither NVC Fund nor NVC Fund Holding Trust were audited during the relevant time period because, among other things, the Issuers were purchasing assets of NVC

Fund and NVC Fund Holding Trust.

210.   It would have been important to a reasonable investor to know that the "USD $10 trillion" valuation of NVC Fund Holdings Trust was not supported by audited financial statements because, among other things, statements about the value of NVC Fund Holdings Trust affected the value of NVC Fund, the assets of which were being purchased by the Issuers.

### 2.    Second Round of Materially False Public Announcements

211.   In press releases issued on January 12, 16 and 17, 2018, the Issuers announced their acquisition of the NVC Fund's assets and stated that NVC Fund Holding Trust had been appraised and valued and that it had a Prime Investment Grade credit rating.

212.   In a January 12, 2018 press release titled "[VICT] Acquires $100,000,000 in 'AAA' Rated Assets to Bolster Balance Sheet," VICT announced that:

(a)    VICT "has acquired 2,045 trust units from NVC Fund LLC, a Delaware, LLC ("NVC"), a Trust Manager of NVCFUND Holding Trust, respectively."

(b)    "On October 7, 2017, Standard [*sic*] and Partners a respected Auditing firm appraised and valued the NVC FUND Holding Trust business in accordance with … (USPAP) as promulgated by the … (IVS) published by the International Valuation Standards Council covering the last 3 years. The Fair Market Value of One Trust Certificate Unit was appraised and valued at Forty-Eight-Thousand-Eight-Hundred and-Eighty-One US Dollars ($48,881). On October 15, 2017 Saifur Rahman and Associates scored NVCFUND Holding Trust a credit rating of 1.2 ('AAA' equivalent), meaning a Prime Investment Grade Rate."

(c)    "Said VICT CEO Patrick Johnson: 'The acquisition of these AAA rated NVC Assets with convertible preferred stock is a great way to bring substantial Net Asset Value to the company's books.'"

(d)    "NVC FUND HOLDINGS manage[s] portfolio companies supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value."

213.   In a January 16, 2018 press release titled "[CHIT] Acquires $250,000,000 in 'AAA' Rated Assets to Bolster Balance Sheet," CHIT announced that:

(a)    CHIT "has acquired 5,441 trust units from NVC Fund LLC, a Delaware, LLC ("NVC"), a Trust Manager of NVCFUND Holding Trust, respectively."

(b)    "On October 7, 2017, Standard [*sic*] and Partners a respected Auditing firm appraised and valued the NVC FUND Holding Trust business in accordance with … (USPAP) as promulgated by the … (IVS) published by the International Valuation Standards Council covering the last 3 years. The Fair Market Value of One Trust Certificate Unit was appraised and valued at Forty-Eight-Thousand-Eight-Hundred and-Eighty-One US Dollars ($48,881). On October 15, 2017 Saifur Rahman and Associates scored NVCFUND Holding Trust a credit rating of 1.2 ('AAA' equivalent), meaning a Prime Investment Grade Rate."

(c)    "Said CHIT CEO Patrick Johnson: 'The acquisition of these AAA rated NVC Assets with convertible preferred stock is a great way to bring substantial Net Asset Value to the company's books.'"

(d)    "NVC FUND HOLDINGS entities manage[s] assets supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value."

214.   In a January 17, 2018 press release titled "[PDXP] Acquires $350,000,000 in 'AAA' Rated Assets to Bolster Balance Sheet," PDXP announced that:

(a)    PDXP "has acquired 7,160 trust units from NVC Fund LLC, a Delaware, LLC ("NVC"), a Trust Manager of NVCFUND Holding Trust,

respectively."

      (b)    "On October 7, 2017, Standard [*sic*] and Partners a respected Auditing firm appraised and valued the NVC FUND Holding Trust business in accordance with … (USPAP) as promulgated by the … (IVS) published by the International Valuation Standards Council covering the last 3 years. The Fair Market Value of One Trust Certificate Unit was appraised and valued at Forty-Eight-Thousand-Eight-Hundred and-Eighty-One US Dollars ($48,881). On October 15, 2017 Saifur Rahman and Associates scored NVCFUND Holding Trust a credit rating of 1.2 ('AAA' equivalent), meaning a Prime Investment Grade Rate."

      (c)    "Said PDXP CEO Patrick Johnson: 'The acquisition of these AAA rated NVC Assets with convertible preferred stock is a great way to bring substantial Net Asset Value to the company's books.'"

      (d)    "NVC FUND HOLDINGS manage[s] portfolio companies supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value."

      **a.**    **The second round of announcements repeated the false statement that an audit of NVC Fund Holding Trust had been conducted**

215.    The Issuers' second round of press releases repeated the false statement that NVC Fund Holdings Trust's "trillion" dollar valuation was supported by "financial statements" that were audited by a "CPA firm".

216.    As discussed above and in paragraphs 203-208, Preparer A and Standards and Partners only conducted a "review" of the financial statements of NVC Fund Holding Trust, and not an independent verification of the NVC Fund Holding Trust's or NVC Fund's assets or bank accounts.

217.    During the relevant time period, no audit of NVC Fund Holding Trust's or NVC Fund's financial statements was conducted by Standards and Partners.

218.    As discussed above, in the August 2017 report, Preparer A and

Standards and Partners stated that "we do not express an audit opinion" because its review was "substantially less in scope than an audit conducted in accordance with International Standards on Auditing," and that they could not "reconcile [NVC Fund Holding Trust's] bank accounts" because "[t]he reconciliation letters did not come from the Banks." The August 2017 report was not referenced in any of the six press releases at issue, nor was it filed with CHIT's Form 8-K and Form 8-K/A at issue.

219. It would have been important to a reasonable investor to know that neither NVC Fund nor NVC Fund Holding Trust were audited during the relevant time period because, among other things, the Issuers were purchasing assets of NVC Fund and NVC Fund Holding Trust.

220. It would have been important to a reasonable investor to know that the "USD $10 trillion" valuation of NVC Fund Holdings Trust was not supported by audited financial statements because, among other things, statements about the value of NVC Fund Holdings Trust affected the value of NVC Fund, the assets of which were being purchased by the Issuers.

### b. The second round of announcements falsely stated that the assets the issuers acquired had a AAA rating and that the assets were legitimately valued

221. In the second round of announcements, Johnson and the Issuers also misrepresented that NVC Fund Holding Trust's assets had been legitimately valued and legitimately rated "AAA" by a purported October 2017 "valuation" of the NVC Fund Holding Trust business (the "October 2017 valuation report") and a purported October 2017 credit rating report (the "October 2017 credit rating report").

222. Neither the October 2017 valuation report nor the October 2017 credit rating report were legitimate.

223. The supposed "valuation" in the October 2017 valuation report was prepared by Preparer A, the same individual that, through Standards and Partners, purportedly "audited" NVC Fund Holdings and prepared the August 2017 report.

224.   The supposed "credit rating" in the October 2017 credit rating report was prepared by another person Ekejija found on social media on or about October 2017 ("Rater B").

225.   Rater B had advertised on social media his willingness to generate credit rating reports for $100.

226.   Ekejija paid $200 for the October 2017 credit rating report.

227.   The October 2017 valuation report of NVC Holdings Trust and the assets to be acquired are based on the August 2017 Standards and Partners' "audit" report.

228.   The credit rating of the NVC Fund Holdings Trust and the assets to be acquired in the October 2017 credit rating report are based on the October 2017 valuation report, which in turn is based on the August 2017 Standard and Partners "audit" report.

229.   As explained above, no such audit ever occurred.

230.   In the period before the announcement, the Issuers' own reports and financial statements showed negative net total assets and losses:

(a)   According to its 3Q 2017 Form 10-Q-A, filed August 9, 2017, CHIT had negative net total assets and incurred net losses of about $2.78 million in the nine months ended May 31, 2017.

(b)   CHIT's financial statements for the quarter ending May 31, 2017 contained a "going concern" note.

(c)   PDXP's own financial statements (filed with OTC Markets Group Inc. on March 6, 2018) for the quarter ending September 30, 2017, showed negative net total assets and a $1,277 operating loss for the quarter.

(d)   VICT's own financial statements (filed with OTC Markets Group Inc. on November 16, 2017) for the quarter ending September 30, 2017, reported negative net total assets and a loss of $791,941 for the quarter.

231.   It would have been important to a reasonable investor to know that the

valuation and credit rating of NVC Fund Holdings Trust, and thus the assets to be acquired by the Issuers, were not in fact based on audited financials.

### 3.   Third Round of Materially False Public Announcements

232.   In a January 31, 2018 dated Form 8-K report filed on February 1, 2018, with the SEC, CHIT stated that it had "entered into a Securities Purchase Agreement … by and among [CHIT], and NVC Fund LLC, a Delaware limited liability company …, and issuer of AAA rated trust units …," whereby "[CHIT] agreed to purchase … (5,114) Trust Units … in exchange for One Hundred Million … shares of [CHIT's] Series B Preferred Stock, valued at $2.50 per share, or an aggregate value of Two Hundred Fifty Million Dollars ($250,000,000)."  The Form 8-K was signed by Johnson, as CHIT's CEO.

233.   The Form 8-K included a copy of the securities purchase agreement between CHIT and NVC Fund.

234.   The purchase agreement identified Exhibit A as the NVC Fund's valuation report and Exhibit B as NVC Fund's audited financial statement.  Neither was attached to the Form 8-K.

235.   In a March 19, 2018 dated Form 8-K/A filed with the SEC, CHIT stated that it had "entered into a Securities Purchase Agreement … by and among [CHIT], and NVC Fund LLC, a Delaware limited liability company …, and issuer of AAA rated trust units …," whereby "[CHIT] agreed to purchase … (5,114) Trust Units … in exchange for One Hundred Million … shares of [CHIT's] Series B Preferred Stock, valued at $2.50 per share, or an aggregate value of Two Hundred Fifty Million Dollars ($250,000,000)."  The Form 8-K/A was signed by Johnson, as CHIT's CEO.

236.   The Form 8-K/A identified as Exhibit 2.1 the securities purchase agreement.

237.   The securities purchase agreement identified Exhibit B as NVC's audited financial statement.

238.   NVC's audited financial statement was not attached to Exhibit 2.1 or the

Form 8-K/A.

239.   The Form 8-K/A identified as Exhibit 2.3 the October 2017 valuation report and Exhibit 2.4 as the October 2017 credit rating report. Both were attached to the Form 8-K/A.

### a.   The third round of announcements contained the same false statements as the first and second round of announcements

240.   As explained above and in paragraphs 195-231, the Form 8-K report's representations as to the valuation and rating of the NVC Fund and its assets, and the existence of audited financial statements were all false.

241.   It would have been important to a reasonable investor to know that neither NVC Fund nor NVC Fund Holding Trust were audited during the relevant time period because, among other things, CHIT purchasing assets of NVC Fund and NVC Fund Holding Trust.

242.   It would have been important to a reasonable investor to know that the trillion dollar valuation of NVC Fund Holdings Trust was not supported by audited financial statements because, among other things, statements about the value of NVC Fund Holdings Trust affected the value of NVC Fund, the assets of which were being purchased by CHIT.

243.   It would have been important to a reasonable investor to know that the valuation and credit rating of NVC Fund Holdings Trust and NVC Fund, and thus the assets to be acquired by the CHIT, were not in fact based on audited financials.

### 4.   Johnson, Ekejija, and NVC Fund Knew, Or were Reckless in not Knowing, They Were Disseminating Materially Misleading Statements

### a.   Ekejija

244.   Ekejija knew, or was reckless in not knowing, that he was pumping the Issuers' stock with materially false and misleading information.

245.   Before agreeing to proceed with the Issuers' public statements

concerning NVC Fund, on or about December 2017, Ekejija was told by Associate A over electronic Skype message that once announced, the purported asset deals should dramatically increase the Issuers' stock price, possibly allow them to then tap into a "$1 billion" line of credit, and potentially permit the Issuers to list their stock on NASDAQ.

246.    Knowing this, or being reckless in not knowing, Ekejija approved and authorized the use of statements that would fraudulently inflate the Issuers' stock price.

247.    Ekejija knew, or was reckless in not knowing, that NVC Fund and NVC Fund Holding Trust-related claims in the Issuers' press releases and SEC filings were not true.

248.    Ekejija knew, or was reckless in not knowing, that the statement that NVC Fund Holdings Trust "manage[s] assets supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value" was false:

(a)     Based on his review of the August 2017 report on or about August 2017, Ekejija knew, or was reckless in not knowing, that Standards and Partners had not audited NVC Fund or NVC Fund Holdings Trust.

(b)     On or about August 2017, Ekejija asked Associate A via electronic Skype message why the August 2017 report was a "financial statement review" and not a "Financial Statement Audited Report."

(c)     On or about August 2017, in response to Associate A's statement that a "financial statement review" "may mean the same" as a "Financial Statement Audited Report," Ekejija explained to Associate A via electronic Skype message that "[a] financial review is an interim report midway between end of year financial statement."

(d)     Based on his review of the August 2017 report on or about August 2017, Ekejija knew, or was reckless in not knowing, that the August 2017 report was

only a financial review that did not independently verify the fund's assets.

(e) During testimony with the SEC on October 18, 2018, Ekejija stated that with the August 2017 report, he "did not get an [audited report]," that he "wanted an audited financial statement" from Standards and Partners but that Preparer A told Ekejija "we cannot – we can't give you [an audited financial statement] – [the financial review] is the best [Standards can provide]."

249.  Ekejija knew, or was reckless in not knowing, that the statements regarding the valuation and credit rating of NVC Fund Holding Trust were false:

(a) Ekejija understood that the asset valuation had to be supported by audited financial statements, and further understood that NVC Fund's "AAA" credit rating relied on the asset valuation.

(b) As discussed above, neither the asset valuation nor the credit rating were supported by an audit.

(c) As discussed above, Ekejija knew that neither the asset valuation nor the credit rating were supported by an audit.

(d) Ekejija also knew that the basis for the credit rating was fictitious.

(e) Between October 12 and 14, 2017, Ekejija repeatedly rejected Rater B's report that did not provide NVC Fund's assets with a "AAA" rating.

(f) Only after Ekejija pressured him did Rater B, in or about October 14, 2017, revise the rating to "AAA."

(g) After a court ordered Ekejija and NVC Fund to produce documents in response to the SEC June 2018 subpoena requesting documents supporting the valuation, Ekejija produced, among other things:

i.  A purported Treasury Direct account and related asset transactions representing that NVC Fund's assets were held at that institution; and

ii.  Account statements and confirmations of funds dated between 2012 to 2015 purporting to show billions, and at one point a trillion, in assets held at U.S. Capital Bank, U.S. Capital Funding II Series Trust 1, and US Capital

Investments II (HK) Limited, some of which are signed by "Robert Fowler."

          iii.      U.S. Capital Funding II Series Trust 1 was a defendant in a prime bank fraudulent scheme charged in *SEC v. Robert Fowler et al.*, Civil Action No. 1:13-CV-1656-SCJ (N.D. Ga July 2014), where the SEC alleged that "U.S. Capital Funding II Series Trust 1 (a/k/a US Capital Investments II (HK) Limited)" and Fowler, the CEO and control person of U.S. Capital Funding II Series Trust 1, defrauded at least three investors, resulting in the defendants obtaining $350,000 from the investors purportedly, among other things, to generate shared investment returns, but instead used those funds for personal expenses.  The SEC also alleged that U.S. Capital Funding II Series Trust 1 misrepresented that it had a "S&P Triple-A (AAA) rating" and assets "valued in the Trillions."  The SEC alleged that U.S. Capital Funding II Series Trust 1 "was officially dissolved in February 2012, but Fowler continues to use the company's name in his solicitation of prospective investors." U.S. Capital Funding II Series Trust 1's assets were frozen, and a default judgment for violations of Section 10(b) of the Securities Exchange Act and Section 17(a) of the Securities Act, was entered against it and Fowler.

250.   Because Ekejija controlled NVC Fund Holdings Trust and NVC Fund, his scienter may be attributed to NVC Fund.

      **b.**    **Johnson**

251.   Johnson knew, or was reckless in not knowing, that he was pumping the Issuers' stock with false information.

252.   Johnson also knew, or was reckless in not knowing, that the statement that NVC Fund Holdings Trust "manage[s] assets supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value" was false.

253.   Johnson also knew, or was reckless in not knowing, that the Issuers' statement that NVC Fund Holdings Trust "manage[s] assets supported by CPA firm audited financial statements valued over USD 10 Trillion Dollars of Net Asset Value"

1  would fraudulently increase the Issuers' stock price.

2      254.   Before entering into the NVC Fund deals, Johnson received NVC Fund's

3  purported August 2017 "audit" report, the October 2017 valuation report, and the

4  October 2017 credit rating report from Ekejija and/or NVC Fund.

5      255.   In testimony to the SEC on December 12, 2019, Johnson acknowledged

6  that NVC Fund Holding Trust's and NVC Fund's asset valuation "was substantial"

7  and that at the time of making the relevant statements concerning NVC Fund Holding

8  Trust and NVC Fund, he wondered how the size of those entities "g[o]t to be this

9  big," and "how did [Ekejija] get to be this size."

10     256.   Despite these unresolved questions and/or red flags in his own mind,

11  Johnson did nothing to independently verify the claims.

12     257.   Johnson never reviewed the August 2017 report, the October 2017

13  valuation report, or the October 2017 credit rating report in detail to verify their

14  conclusions.

15     258.   Before considering the NVC Fund deals, Johnson had never heard of

16  Standards and Partners or Saifur Rahman and Associates.

17     259.   Apart from potentially checking websites for the entities that employed

18  Preparer A and Rater B, Johnson did not verify the existence or status of Standards

19  and Partners or Saifur Rahman and Associates with which Preparer A and Rater B

20  purported to be associated.

21     260.   Despite conducting no independent verification of the August 2017

22  report, the October 2017 valuation report, or the October 2017 credit rating report,

23  Johnson prepared and approved the issuance of the announcements and the Forms 8-

24  K.

25     261.   Despite conducting no independent verification of the August 2017

26  report, the October 2017 valuation report, or the October 2017 credit rating report,

27  Johnson issued false public statements about the acquisition of $700 million in assets.

28     262.   In the public announcements, Form 8-K, and Form 8-K/A, Johnson

omitted from those public statements the August 2017 report.

263.   As discussed above, the August 2017 report stated that Standards and Partners had not conducted an audit or independent asset verification of any kind.

264.   Johnson knew, or was reckless in not knowing, that the statements regarding the Issuers' acquisition of NVC Fund's assets worth hundreds of millions of dollars were misleading.

265.   As discussed above, in the period before the announcement, the Issuers' own reports and financial statements showed negative net total assets and losses:

(a)   According to its 3Q 2017 Form 10-Q-A, filed August 9, 2017, CHIT had negative net total assets and incurred net losses of about $2.78 million in the nine months ended May 31, 2017.

(b)   CHIT's financial statements for the quarter ending May 31, 2017 contained a "going concern" note.

(c)   PDXP's own financial statements (filed with OTC Markets Group Inc. on March 6, 2018,) for the quarter ending September 30, 2017, showed negative net total assets and a $1,277 operating loss for the quarter.

(d)   VICT's own financial statements (filed with OTC Markets Group Inc. on November 16, 2017) for the quarter ending September 30, 2017, reported negative net total assets and a loss of $791,941 for the quarter.

266.   Because he controlled the Issuers, Johnson was the maker of each of the Issuers' false and misleading public statements.

**5.   The Issuers' Stock Prices Increased Significantly After Each Public Statement**

267.   Following these three rounds of public statements, the stock price for each of the Issuers and their trading volume increased significantly.

268.   The price and volume moved as follows after the the public statements:

| ISSUER | 1ST ROUND OF PRESS RELEASES | | 2ND ROUND OF PRESS RELEASES | | 3RD ROUND: CHIT FORM 8-K | |
|---|---|---|---|---|---|---|
| | % change in share price following announcement | % change in trade volume following announcement | % change in share price following announcement | % change in trade volume following announcement | % change in share price following announcement | % change in trade volume following announcement |
| CHIT | + 250% | +5,168% | + 42.9% | + 193.4% | + 14.3% | + 237% |
| PDXP | - 28.6% | + 59.8% | + 9.8% | - 44% | | |
| VICT | + 83% | + 345.7% | + 123% | +461.7% | | |

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

### (against Defendant Johnson)

269.   The SEC realleges and incorporates by reference paragraphs 1 through 268 above.

270.   In connection with the CHIT offering and the sale of the Issuer shares after the three announcements, Defendant Johnson misled and deceived market professionals, namely the transfer agent and brokerage firm.  Johnson executed a CHIT settlement agreement with Company A that falsely stated that certain Creditor B debts in the Section 3(a)(10) transaction were accurately described, *bona fide*, and outstanding.  Johnson also publicly deployed materially false press releases and SEC filings concerning NVC Fund Holding Trust's and NVC Fund's false asset valuation in connection with the purchase or sale of the Issuers' stock.

271.   By engaging in the conduct described above, Defendant Johnson, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

272.   Defendant Johnson, with scienter, made untrue statements of a material

fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading by the conduct described in detail above.

273.   By engaging in the conduct described above, Defendant Johnson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (against Defendants Johnson, Everett, Ekejija, and NVC Fund)

274.   The SEC realleges and incorporates by reference paragraphs 1 through 268 above.

275.   Defendants Johnson, Ekejija, and NVC Fund misled and deceived investors and prospective investors about the valuation and credit rating of NVC Fund Holding Trust and the acquisition target NVC Fund, the validity of the audit of NVC Fund Holding Trust's valuation, and the Issuers' acquisition of hundreds of millions of dollars of assets.

276.   Defendant Everett misled and deceived market professionals, namely the transfer agent and brokerage firm, about the validity of the Section 3(a)(10) exemption in the VICT transactions.

277.   Defendant Johnson misled and deceived market professionals, namely the transfer agent and brokerage firm, about the validity of the Section 3(a)(10) exemption in the CHIT transaction.

278.   By engaging in the conduct described above, Defendants Johnson, Everett, Ekejija, and NVC Fund, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

41

securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

279.   Defendants Johnson, Everett, Ekejija, and NVC Fund, with scienter, employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

280.   By engaging in the conduct described above, Defendants Johnson, Everett, Ekejija, and NVC Fund, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendant Everett)

281.   The SEC realleges and incorporates by reference paragraphs 1 through 268 above.

282.   In connection with the VICT offerings, Defendant Everett caused VICT to falsely state in the representations and warranties section of its settlement agreement with Company A that the Creditor A debt included in the VICT Section 3(a)(10) transactions was accurately described, *bona fide*, and outstanding.  This information was material, and Everett obtained $190,000 as result.

283.   By engaging in the conduct described above, Defendant Everett, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

284.   Defendant Everett, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

285.   By engaging in the conduct described above, Defendant Everett violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against Defendants Johnson and Everett)**

286.   The SEC realleges and incorporates by reference paragraphs 1 through 268 above.

287.   Defendant Everett misled and deceived market professionals, namely the transfer agent and brokerage firm, about the validity of the Section 3(a)(10) exemption in the VICT transactions.

288.   Defendant Johnson misled and deceived market professionals, namely the transfer agent and brokerage firm, about the validity of the Section 3(a)(10) exemption in the CHIT transaction.

289.   By engaging in the conduct described above, Defendants Johnson and Everett, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

290.   Defendants Johnson and Everett, with scienter, employed devices, schemes and artifices to defraud; and, with scienter or negligence, engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

291.   By engaging in the conduct described above, Defendants Johnson and Everett violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FIFTH CLAIM FOR RELIEF

### Unregistered Offer or Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Johnson and Everett)

292.   The SEC realleges and incorporates by reference paragraphs 1 through 268 above.

293.    Defendant Johnson offered and sold shares of VICT and CHIT in securities transactions not registered with the SEC.

294.   VICT and CHIT offered and sold shares of VICT and CHIT respectively in securities transactions not registered with the SEC.

295.   Company A offered and sold shares of VICT and CHIT in unregistered securities transactions.

296.   None of the offers and sales were registered with the SEC, and no exemption from registration applied.

297.   Johnson directly participated in the offer and sale of the unregistered securities in the VICT and CHIT transactions to Company A because he organized and controlled the VICT and CHIT side of the Section 3(a)(10) transactions and signed the settlement agreements pursuant to which the shares were issued.

298.   Johnson indirectly participated in the offer and sale of the unregistered securities in the VICT and CHIT transactions to Company A because he was a necessary participant and substantial factor in those sales by, among other things, (a) directing VICT and CHIT to engage in these Section 3(a)(10) transactions and, *inter*

*alia*, signing the settlement agreements with Company A that formed the basis for the debt exchange; and (b) orchestrating the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor B.

299.   Everett indirectly participated in the offer and sale of the unregistered securities in the VICT transactions to Company A because he was a necessary participant and substantial factor in those sales by, among other things, orchestrating the fabrication of the documentation that served as the very basis of the debt for the securities transactions and secured the cooperation of the purported original debtholder, Creditor A.

300.   Johnson and Everett indirectly participated in Company A's offer and sale of the VICT and CHIT securities (Johnson as to both the CHIT and VICT transactions; Everett as to the VICT transactions only) because they were necessary participants and substantial factors in those sales by, among other things, (a) Johnson organizing and controlling the VICT and CHIT side of the Section 3(a)(10) transactions and signing the settlement agreements pursuant to which the shares were issued; (b) Johnson orchestrating the fabrication of the documentation that served as the very basis of the debt for the securities transactions and securing the cooperation of one of the purported original debtholders, Creditor B; and (c) Everett orchestrating the fabrication of the documentation that served as the very basis of the debt for the securities transactions and securing the cooperation of one of the purported original debtholders, Creditor A.

301.   By engaging in the conduct described above, Defendants Johnson and Everett, each of them, directly or indirectly, singly and in concert with others, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after

sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

302.   By engaging in the conduct described above, Defendants Johnson and Everett have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Johnson and Everett, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Ekejija and NVC Fund, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently enjoining Defendants Johnson and Everett, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

**V.**

Order Defendant Everett to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**VI.**

Order Defendants Johnson, Everett, Ekejija, and NVC Fund to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VII.**

Bar Defendants Johnson and Everett from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), pursuant to pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 2l(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

**VIII.**

Bar Defendants Johnson and Everett from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock under Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act.

**IX.**

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**X.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 30, 2020                    Respectfully Submitted,


                                              */s/ Michael R. Sew Hoy*
                                              MICHAEL R. SEW HOY
                                              ROBERTO A. TERCERO
                                              MANUEL VAZQUEZ
                                              Attorneys for Plaintiff
                                              Securities and Exchange Commission

# APPENDIX A

## ANNOUNCEMENTS AND FORMS 8-K

| Issuer | 1st Round of Press Releases | 2nd Round of Press Releases | 3rd Round: Form 8-K |
|--------|------------------------------|------------------------------|----------------------|
| CHIT | 1/3/18 | 1/16/18 | 2/1/18 – Form 8-K<br>3/19/18 – Form 8-K/A |
| PDXP | 1/4/18 | 1/17/18 | |
| VICT | 1/4/18 | 1/12/18 | |